STANDARD LIME AND CEMENT COM-
PANY (formerly known as the Stand-
ard Lime and Stone Company)

v.

The UNITED STATES.

No. 278-59.

United States Court of Claims.

March 13, 1964.

940

Robert J. Casey, New York City, for plaintiff. Clark, Carr & Ellis, New York City, on the briefs.

S. Laurence Shaiman, Washington, D. C., with whom was Louis F. Oberdorfer, Asst. Atty. Gen., for defendant. Edward S. Smith, Lyle M. Turner, C. Moxley Featherston and Philip R. Miller, Washington, D. C., on the briefs.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

LARAMORE, Judge.

This is a suit for refund of Federal income taxes for the taxable period January 1, 1954 to November 30, 1954. During this period taxpayer owned and operated at Martinsburg, West Virginia, an underground limestone mine and a shale quarry, together with a plant for the processing of these materials into finished cement. The ultimate question for determination in this case is the amount of gross income attributable to the mining of these minerals for the purpose of computing taxpayer's percentage depletion allowance under section 613 of the Internal Revenue Code of 1954.[1] Specifically in issue before this court is whether certain indirect costs incurred apart from

---

1. Section 613 of the Internal Revenue Code of 1954, as amended by section 302(b) of the Public Debt and Tax Rate Extension Act of 1960, 74 Stat. 290, 292, provides in pertinent part as follows:

"§ 613. Percentage depletion

"(a) *General rule.*—In the case of mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b) of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). * * *

\* \* \* \* \*

"(c) *Definition of gross income from property.*—For purposes of this section—

"(1) *Gross income from the property.* —The term 'gross income from the property' means, in the case of a property

other than an oil or gas well, the gross income from mining.

"(2) *Mining.*—The term 'mining' includes not merely the extraction of the ores or minerals from the ground but also the treatment processes considered as mining described in paragraph (4) (and the treatment processes necessary or incidental thereto), and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which such treatment processes are applied thereto as is not in excess of 50 miles, unless the Secretary or his delegate finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills.

\* \* \* \* \*

"(4) *Treatment processes considered as mining.*—The following treatment processes where applied by the mine owner or operator shall be considered as mining to the extent they are applied to

the mining (pre-kiln feed) and manufacturing (post-kiln feed) processes should be properly allocated to these two processes for computation of plaintiff's "gross income from mining" under the proportionate profits method.

On its original Federal income tax return for the taxable period in issue, plaintiff computed its percentage depletion allowance with respect to the limestone and shale mined by it at its Martinsburg facilities, which it used in the manufacture of cement, based on a "gross income from the property" figure equivalent to the representative field or market price of the crushed limestone and shale in the Martinsburg area.

On February 13, 1958, taxpayer filed a timely claim for refund of alleged overpayment of Federal income tax for the taxable year in issue. In this claim for refund, taxpayer computed its percentage depletion allowance on the basis of gross income derived from the sale of finished cement. Having received no notice of any action on this claim for refund from the Commissioner of Internal Revenue, taxpayer instituted suit in this court reiterating its claim that it was entitled to compute its percentage depletion allowance on gross income derived from the sale of finished cement.

While the instant suit was pending before this court, the Supreme Court rendered its decision in the now landmark case of United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L. Ed.2d 1581 (1960) where the Court held that an integrated miner-manufacturer had to compute its percentage depletion allowance based on "gross income from the property" of its first commercially marketable product and not as claimed by the taxpayer, based on "gross income from the property" at the finished product. As a result of the Cannelton decision, legislation was enacted by Congress (Public Law 86–564, 74 Stat. 290; Public Law 86–781, 74 Stat. 1017) giving taxpayers engaged in the mining of minerals used in the production of cement the right, pursuant to election, to compute their "gross income from the property," for purposes of the percentage depletion allowance with respect to such minerals for taxable years beginning prior to January 1, 1961, at the point of introduction of the minerals into the kiln.[2] A taxpayer so electing was required to forego its claim for percentage depletion based on "gross income from the property" at the finished product.

Taxpayer, by letter addressed to the District Director of Internal Revenue, Baltimore, Maryland, elected to compute its percentage depletion allowance at the kiln cutoff point as provided by Public Law 86–781, supra, for the taxable year in issue. Accordingly, it filed an amended Federal income tax return, utilizing therein the proportionate profits method of computing its "gross income from the property" at kiln feed, there being no representative field or market price for plaintiff's minerals at that point.[3]

Plaintiff's amended return for the period in issue was thoroughly audited by a

the ore or mineral in respect of which he is entitled to a deduction for depletion under section 611:

\* \* \* \* \*

"(F) in the case of calcium carbonates and other minerals when used in making cement—all processes (other than preheating of the kiln feed) applied prior to the introduction of the kiln feed into the kiln, but not including any subsequent process; \* \* \*."

2. Section 302(c) of the Public Debt and Tax Rate Extension Act of 1960, 74 Stat. 290, 293, provided that the section 302(b) amendments applied only with respect to taxable years beginning after

December 31, 1960. In order to eliminate the gap created for years prior to 1960, Congress passed Public Law 86–781, 74 Stat. 1017, 1018 (1960) which amended section 302(c), supra, permitting an election to be made by a taxpayer, in the case of calcium carbonates when used in making cement, to apply the provisions of section 613(c) of the 1954 Code, as amended, to all open years in lieu of corresponding provisions of prior law.

3. This is in accordance with Treasury Regulation 118, § 39.23(m)–1(e) (3) made applicable to taxable years under the 1954 Code by T.D. 6091, 1954–2 Cum. Bull. 47.

representative of the Office of the District Director of Internal Revenue, Baltimore, Maryland. As a result of such audit, the Government took issue with the treatment afforded by taxpayer in its amended return to the following items: (1) interplant overhead, (2) cash discounts, (3) packing and loading costs, (4) cost of containers, (5) purchased additives, (6) cost of warehousing, (7) freight costs, (8) inventory adjustments. The controversy between the parties concerns the way in which the proportionate profits method is to be applied with regard to the items in dispute. Taxpayer concedes the correctness of the Government's position with respect to item (7), freight costs.

Before we can reach a final decision on the merits of this controversy, we have to dispose of several procedural issues raised by the Government: On June 15, 1962, just three days before this case was set for trial, the Government filed a motion for summary judgment predicated upon this court's alleged lack of jurisdiction to hear this controversy.[4] In support of said motion, the Government contends that the issues raised in the petition had been rendered moot by reason of taxpayer's election under Public Law 86–781, supra. The Government further urges that this court's lack of jurisdiction is also due to taxpayer's failure to comply with the prerequisites for the bringing of a suit for refund of Federal income tax. Specifically the Government asserts that taxpayer has failed to comply with the requirements of section 6532(a) (1) of the Internal Revenue Code of 1954, which provides:

"(1) *General rule.*—No suit or proceeding under section 7422(a) for the recovery of any internal revenue tax, penalty, or other sum, shall be begun before the expiration of 6

months from the date of filing the claim required under such section unless the Secretary or his delegate renders a decision thereon within that time, * * *."

In other words, the Government's contentions are based on the proposition that since taxpayer's original claim for refund was predicated on its entitlement to a refund based on its percentage depletion allowance computed from gross income of the end product, a new and distinct claim for refund has arisen because of taxpayer's election under Public Law 86–781, supra, wherein gross income is computed at the kiln cutoff point. Thus, the Government argues, the original claim has become moot and taxpayer must meet all the procedural requirements for instituting a new claim for refund, i. e., a claim for refund with the Commissioner of Internal Revenue,[5] a 6-month waiting period if no decision on the claim is rendered,[6] and finally the instituting of a suit for refund.[7]

We believe that under the circumstances of this case taxpayer's election to compute its percentage depletion allowance based on "gross income from the property" at the kiln cutoff does not give rise to a new and distinct claim for refund. Consequently, the issue never became moot and taxpayer need not meet the procedural requirements for instituting a new claim for refund. We say this because "[i]ncome-tax liability for any one year is a single cause of action. Each taxable year constitutes a separate cause of action, and in every suit for refund one of the questions presented is the determination of the amount by which the taxpayer has overpaid his taxes for the year involved." United States v. C. C. Clark, Inc., 159 F.2d 489, 490 (5th Cir. 1947). Taxpayer's entitlement to a refund is still centered on what is its prop-

4. We denied the motion without prejudice and the case proceeded to trial.

5. Internal Revenue Code of 1954, § 7422 (a).

6. Internal Revenue Code of 1954, § 6532 (a) (1). In the instant case, the Secretary or his delegate did not render a decision on taxpayer's amended return filed in 1960.

7. Internal Revenue Code of 1954, § 7422 (a).

er percentage depletion allowance. International Curtis Marine Turbine Co. v. United States, 74 Ct.Cl. 132, 139, 56 F.2d 708, 711 (1932). What has changed by taxpayer's election, pursuant to legislation enacted by Congress, is the manner in which the amount is to be computed. Electric Storage Battery Co. v. McCaughn, 3 Cir., 54 F.2d 814 (1931). Rule 8(b) of this court requires that "[a]ll pleadings shall be so construed as to do substantial justice." We believe that if we adopt the Government's narrow construction of the original petition, taxpayer would be deprived of a prompt decision on a matter so vital to the orderly conduct of its business. Cf. Register Publishing Co. v. United States, D.C., 189 F.Supp. 626, 631 (Conn.1960).

■■ There is an alternative ground for disposing of the Government's contention that this court lacks jurisdiction to hear this case, even if we view taxpayer's election as giving rise to a new and distinct claim for refund. In Rosengarten v. United States, 149 Ct.Cl. 287, 181 F.Supp. 275, cert. denied 364 U.S. 822, 81 S.Ct. 60, 5 L.Ed.2d 53 (1960), we said that an informal claim which fairly gives notice of a taxpayer's intention to press for a refund of taxes is sufficient to satisfy the statutory requirement. See also United States v. Kales, 314 U.S. 186, 62 S.Ct. 214, 86 L.Ed. 132 (1941). We find that taxpayer's amended return filed in 1960, electing to compute its depletion allowance at kiln feed, sufficiently apprised the Commissioner of its claim. Thus, the requirement, under section 7422(a), of filing a claim with the Commissioner has been met and the Government so concedes. Furthermore, we believe that taxpayer has substantially complied with the 6-month waiting period before instituting suit on a claim for refund as required by section 6532(a) (1) of the 1954 Code, supra. We say this because this procedural requirement was enacted by Congress to give the Commissioner of Internal Revenue a reasonable period of time within which to process the claim and to afford an opportunity for

administrative adjustment without suit. Caldwell Sugars, Inc., v. United States, 101 Ct.Cl. 395, 412, 54 F.Supp. 544, 552 (1944); Register Publishing Co. v. United States, supra 189 F.Supp. at 630; Gerrard v. Campbell, 81 F.Supp. 752, 754 (N.D.Ill.1949). The Commissioner has had ample opportunity to consider taxpayer's claim and avoid needless litigation if he felt taxpayer's claim was meritorious.

More than six months had elapsed before trial was held. The record discloses that the parties on numerous occasions conducted settlement conferences. The Government was fully apprised of what constituted taxpayer's claim for refund. We note that the Regional Office conducted an extensive audit of taxpayer's amended return. This court is acting on the merits of the controversy well over six months after the amended returns were filed. The fact that taxpayer did not bring a new suit on its amended claim for refund is not determinative in view of the fact that we have allowed taxpayer to amend its original petition under Rule 18(b) of this court. Once the 6-month waiting period is *in fact* satisfied, the manner in which taxpayer enforces his claim, i. e., either by bringing an independent suit or by amending its original petition, should not be determinative as to whether or not the 6-month requirement has been satisfied and should not give the Commissioner of Internal Revenue fictitious defenses in order to defeat reality. Gerrard v. Campbell, supra 81 F.Supp. at 754. See also, Register Publishing Co. v. United States, supra.

Having disposed of the Government's contentions concerning this court's alleged lack of jurisdiction, we now turn to the merits of the controversy. As stated previously, the ultimate question for determination in this case is the amount of gross income from the property for the purpose of computing the proper depletion allowance under section 613 of the 1954 Code. We note that the statutory enactment defines "gross income from the property" as "gross income from min-

ing." [8] It then specifically prescribes what treatment processes are considered mining. In the case of calcium carbonates used in making cement, gross income from mining must be computed at kiln feed.[9] Since the minerals at this stage of the treatment process are neither sold by the taxpayer nor do they have a representative market or field price, a hypothetical gross income from the property must be constructed in order to compute taxpayer's percentage depletion allowance. It is at once apparent that this hypothetical "gross income from the property" at kiln feed must include the following items: (1) direct costs incurred up to that point, (2) a percentage of the indirect costs,[10] (3) a percentage of the profits. Both parties agree that the proper method of determining "gross income from the property" at this stage is by the use of the proportionate profits method as provided by Treasury Regulation 118, section 39.23(m)–1(e) (3).[11] The controversy between them mainly concerns the way in which the proportionate profits method as proposed by this regulation is to be applied to the items in dispute. Since most of these cost items were incurred apart from the direct processing cost, the question with which we are confronted is whether or not they can be properly allocated, by the use of the proportionate profits method, to both stages of the production process in determining taxpayer's "gross income from the property" at kiln feed.

■ Briefly stated, the proportionate profits method of computing "gross income from the property" attributes to each step of taxpayer's operation the costs (both direct and indirect) attributable to each step plus a proportion of the total profit. United States v. Henderson Clay Products, 324 F.2d 7, 9 (5th Cir. 1963). The basic assumption of the proportionate profits method is that each dollar of costs expended to produce and sell the end product earns the same percentage of the profit. In the case of an integrated cement manufacturer, which utilizes its mined minerals in the production of cement, the proportionate profits method allocates these costs and a proportion of their profits to two distinct stages of operation, i. e., processes up to kiln feed and post-kiln feed processes.[12] The

8. Internal Revenue Code of 1954, § 613 (c) (1).

9. Internal Revenue Code of 1954, § 613 (c) (4) (F).

10. The main issue with which we are concerned is whether all or some of taxpayer's indirect cost can be properly allocated to this hypothetical gross income we are asked to compute.

11. This regulation provides in pertinent part, as follows:
"(3) If the taxpayer sells the crude mineral product of the property in the immediate vicinity of the mine, 'gross income from the property' means the amount for which such product was sold, but, if the product is transported or processed (other than by the ordinary treatment processes described below) before sale, 'gross income from the property' means the representative market or field price (as of the date of sale) of a mineral product of like kind and grade as beneficiated by the ordinary treatment processes actually applied, before transportation of such product (other than transportation treated, for the taxable year, as mining). If there is no such representative market or field price (as of the date of sale), then there shall be used in lieu thereof the representative market or field price of the first marketable product resulting from any process or processes (or, if the product in its crude mineral state is merely transported, the price for which sold) minus the costs and proportionate profits attributable to the transportation (other than transportation treated, for the taxable year, as mining) and the processes beyond the ordinary treatment processes. * * *"

12. The pre-kiln feed processes, as defined by statute, end at the point where the slurry is pumped from the slurry storage basin to ferris wheel feeders and fed into a rotary kiln (step (k) of taxpayer's operations as set out in our findings of fact). Taxpayer's expert, after considering the steps of taxpayer's operations, expressed the opinion that processing of the mined minerals used by plaintiff in the production of cement ends at the point where materials in the form of cement clinker having been mixed with gypsum and ground in the compeb mill to finished cement, come to rest in the storage silo.

direct costs associated with each of these parts are first ascertained. Then the total indirect costs which are incurred for the benefit of the *entire* operation are determined. These indirect costs are allocated to the first part of taxpayer's operation in the proportion as this part's direct costs bear to the aggregate direct costs. Finally, the profit attributable to the first part of taxpayer's operation must be determined and allocated. In making this computation, the profits attributable to those indirect costs which are not incurred for the benefit of the entire operation and thus not properly allocable to taxpayer's mining operation up to kiln feed must be determined and taken from the profit of the entire operation [13] before this "net" profit can be allocated to the pre-kiln feed processes in the proportion as the pre-kiln feed processes direct costs bear to the aggregate direct costs of producing cement. Thus, in simplified form, taxpayer's gross income from the property at kiln feed point is the sum of the following items (a, b, and c):

(a) Total direct cost up to kiln feed
(b) Percentage of indirect cost allocable to process up to kiln feed

$$\left( \frac{\text{Direct cost up to kiln}}{\text{Total processing direct costs}} \times \frac{\text{Indirect costs which}}{\text{can be allocated}} \right)$$

His opinion was based on the fact that, after grinding in the compeb mill, the material stored in the silo is cement, in physical as well as chemical form. It is necessary to establish this point since all costs which are incurred subsequently are not considered direct processing costs, and a determination must be made as to whether or not they can be properly allocated to both stages of production. We accept taxpayer's expert's uncontradicted opinion and find that the post-kiln feed processes end at the point where the materials in the form of cement come to rest in the storage silos (step (q) of taxpayer's operation as set out in our findings of fact).

13. This must be done since the basic assumption of the proportionate profits method is that each dollar of costs (either direct or indirect) expended to produce and sell the end product earns the same percentage of the profit. Thus, in eliminating these cost items, the profits at-

(c) Percentage of "net" profits allocable to kiln feed

$$\frac{\text{Gross income from end product (sales price} \times \text{units sold)}}{-\text{Total costs in producing end product}}$$

Profit from entire operation
$-$Profit attributable to indirect costs which cannot be allocated

Allocable "net" profit

$$\frac{\text{Direct cost up to kiln}}{\text{Total processing direct costs}} \times \text{Allocable "net" profit}$$

The Government contends that Treasury Regulation 39.23(m)–1(e) (3), supra, requires that the starting point for the computation should be the representative field or market price of the first marketable product and not the price for which the end product is sold by taxpayer. We need not decide this issue since the evidence before us fails to show any discrepancy between the sales price and the representative market or field price.[14] Furthermore, we need not determine whether the end product or the first marketable product should be used as the starting point for the computation since in this case the end result would be the same.[15]

Taxpayer asserts that the issue before this court is a factual one involving the acceptable accounting treatment to be accorded to the items in dispute in applying the proportionate profits method. Tax-

tributable thereto should also be eliminated from the total profit on the ratio which the cost of these indirect expenses bears to the total cost of producing cement.

14. The position taken by the Government in this case is contrary to that which it took in United States v. Henderson Clay Products, supra. In that case, the Fifth Circuit was confronted with the problem of whether the taxpayer should be required to use the proportionate profits method for computing its depletion allowance, and in so doing using the sales price of its final product or was it allowed to use the representative field or market price of its first marketable product. The situation in Henderson was unique in that the sales price of the final product was considerably less than the representative market or field price of the first marketable product which taxpayer

15. See Note 15 on Page 946.

payers, therefore, called as witnesses, two eminently qualified accounting experts to testify as to their opinion with respect to the acceptable accounting treatment to be accorded such items. We do not disagree with taxpayer's experts' opinions as to the proper accounting treatment to be given to the items in dispute. However, the issue before us is not factual but a legal one. We are asked to construct a hypothetical "gross income from the property" at the kiln feed stage for the purpose of computing taxpayer's proper percentage depletion allowance. In so doing, we are confronted with the question whether the indirect cost items in dispute can be properly allocated to the pre-kiln stage, thus forming a component of this hypothetical gross income we are asked to compute. In other words, we must determine whether Congress intended to include these cost items in its definition of gross income from mining under section 613. This clearly calls for a legal determination of Congressional intent and not a factual choice of the proper and acceptable accounting treatment to be accorded such items. The legislative history of the 1960 amendments does not provide us with a solution to our problem. However, the words of the statutory enactment give us a starting point for our analysis.

■■■ We believe that Congress intended to include in gross income from mining only those cost items (and a percentage of the entire profit attributable to them) which were incurred for the benefit of the mining operations as de-

fined in section 613(c) (4). This result is inescapable since we must view depletion as "an allowance for the exhaustion of a capital asset." United States v. Cannelton Sewer Pipe Co., supra, 364 U.S. at 86, 80 S.Ct. at 1587, 4 L.Ed.2d 1581. This capital asset under the statutory definition is measured for depletion purposes in terms of "gross income from mining." It follows that only those costs incurred for the benefit of the mining operation as particularized by the statutory scheme, can be included. The language of subparagraph (F) of subsection 613(c) (4) demands this conclusion, for it specifically includes all processes up to kiln feed "but not including *any subsequent processes.*" We interpret this as excluding any subsequent manufacturing or marketing processes. Admittedly, our holding might be contrary to accepted cost accounting principles, but the purpose of depletion allowance is not to recompense for the cost of manufacturing and marketing of the end product but is to allow for the exhaustion of the mineral assets. Thus the depletion rate must be applied as nearly as possible to the income derived from the mining of the raw materials as defined in the statutory scheme. United States v. Henderson Clay Products, supra, 324 F.2d at 12. In so doing, we must view the miner-manufacturer as selling to itself the processed minerals at the kiln feed stage. United States v. Cannelton Sewer Pipe Co., supra, 364 U.S. at 87, 80 S.Ct. 1581, 4 L.Ed.2d 1581. Thus taxpayer, the miner, does not incur those

did not sell. The court, in ruling against the taxpayer, held that it was required to use the proportionate profits method for its computation and that the sales price of the final product must be the starting point. See the court's definition of the proportionate profits method, 324 F.2d at page 9.

15. Judge Wisdom, speaking for a unanimous court, in United States v. Henderson Clay Products, supra, seems to indicate, 324 F.2d at page 9, footnote 3, that the first marketable product test, as clarified by the Cannelton decision has been effectively removed by Congress by

the addition of section 613(c) (4) which particularizes those treatment processes which are to be treated as part of the mining operation. Indeed, in the explanation of how the proportionate profits method is applied, the court states, 324 F.2d at page 9 that "[t]his is the proportion of the *sales price* of the *final product* * * *.*" This reasoning, if followed a step further, appears to invalidate that portion of Treasury Regulation 118, § 39.23(m)–1(e) (3) requiring that the first marketable product be used in the application of the proportionate profits method. We need not reach this issue.

subsequent costs which its alter ego (the manufacturer and distributor) must incur to sell the end product. To view this in any other perspective would introduce the tax discrimination between integrated and non-integrated miners against which the whole tenor of the Cannelton decision was directed.

With this in mind, we turn to the specific items in dispute.

A. *Interplant Overhead*

■ It is at once apparent that this type of indirect expense is incurred for the benefit of taxpayer's *entire* mining-manufacturing operation, consequently it should be apportioned to both stages of production in the manner that we have prescribed above. By way of illustration, administrative expenses are incurred for the benefit of both the mining operations and the manufacturing processes. Consequently they should be allocated to both stages of production. However, at this stage of the proceedings, we are not determining which costs are to be classified as interplant overhead.[16] This question will have to be determined at the time Rule 38(c) computations are made. At this point we are merely holding that indirect cost items which are incurred for the benefit of the *entire* operation can be properly allocated by taxpayer in making his computation of gross income from the property at kiln feed.

However, before the proper allocation of overhead can be made to these two stages, we must first determine taxpayer's Martinsburg plant's share of the total interplant overhead. In its amended

return for the period in issue, taxpayer, allocated to its Martinsburg plant a portion of the total interplant overhead on the ratio which the direct costs of taxpayer's Martinsburg plant bore to the total direct costs of all its nine plants. The Government now agrees with taxpayer's method of allocation[17] and we accept it as the proper method for purposes of this case.

B. *Cash Discounts*

Taxpayer sold finished cement on the following terms:

"Net cash, 30 days or discount of $.10 per barrel (discount on white cement $.20 per barrel) if paid within 15 days of invoice date."

In its amended return, taxpayer included the amount of cash discounts on sales in gross income and allocated such amount to the two stages of operations in the proportion which direct costs of mining bear to total direct costs. The Government does not challenge the character of the discounts and agrees that they should be included in taxpayer's gross income. Since there is no dispute between the parties that these discounts are cash discounts and not trade discounts, we accept such a characterization.[18]

■ The Government contends that no part of this expense may be allocated to mining since "[n]o part of this expense was incurred at the end of mining when taxpayer theoretically sold the kiln feed to its manufacturing alter ego." The Government's contention fails to envision the purpose which these expense items serve. Taxpayer's experts testified that.

16. Although the record indicates what items make up taxpayer's overhead costs, we are not passing on them since we have not had the benefit of the parties' arguments with respect to the specific items composing taxpayer's overhead costs.

17. Originally the Government took the position that interplant overhead should be allocated among plaintiff's various plants on the basis of each plant's gross receipts.

18. Cash discounts are granted to purchasers in order to encourage prompt payment

thus producing a quicker flow of working capital. They differ from trade discounts in that the latter are granted at the option of the seller no matter when payment is made, depending on market conditions, while the former are availed of entirely at the option of the purchaser. Thus trade discounts are deemed reductions in sales price thus not includible in taxpayer's total gross income, while cash discounts are treated as a financial expense to the vendor and thus includible in taxpayer's gross income. See Rev.Rul. 55–13, 1955–1 Cum.Bull. 285; Rev.Rul. 60–257, 1960–2 Cum.Bull. 197.

the function of a cash discount is to stimulate prompt payment in order to insure a quicker flow of working capital. It is a financial expense which is incurred for the benefit of both stages of the production process since it is obvious that working capital is needed for both the mining and manufacturing processes. Consequently, we must hold that cash discounts are an indirect expense which are incurred for the benefit of the entire operation and as such can be properly allocated in taxpayer's computation of gross income from the property at kiln feed.

## C. Packing and Loading Costs

On its amended return, taxpayer allocated packing and loading costs between pre-kiln feed processes and post-kiln feed processes in the proportion as the direct cost of each bear to their aggregate direct cost. The Government takes the position that these cost items must be broken down into two separate items: First, there are those costs attributable to packing and loading bulk cement; second are the packing and loading costs incurred in selling cement in bags.

The Government contends that the costs incurred in loading bulk cement should be treated as a non-mining expense, no part of which is allocable to mining. It is not clear whether the Government considers this as a direct non-mining expense, thus includible in the total direct cost of processing, or it views these cost items as indirect expenses which cannot be properly allocated to those processes up to kiln feed.[19]

As to those costs incurred in packing and loading cement in bags, the Government takes the position that these costs must be removed along with the elimination from the computation of the cost of the bags and the bag premium.[20]

We are of the opinion that all of taxpayer's packing and loading costs are distribution expenses[21] which cannot be allocated by taxpayer in its computation of gross income from the property at kiln feed. We say this because these cost items are not incurred for the benefit of taxpayer's mining operations. They have no functional relationship to the mining activity. Taxpayer under the statute is entitled to compute its "gross income from mining" from those costs (both direct and indirect) incurred up to kiln feed. This is all the law permits. It is obvious that these cost items are incurred by taxpayer long after the mining processes, as defined by the statute, have ceased. Cf. Morton Salt Co. v. United States, Ct.Cl., 316 F.2d 931, cert. denied 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963).

Consequently, we must hold that those packing and loading costs are indirect costs which are not incurred for the benefit of the entire operation and as such cannot be included in taxpayer's computation of gross income from the property at kiln feed.[22]

## D. Cost of Containers

Taxpayer, in its amended return, excluded from its gross income the additional price charged to customers for shipment of finished cement in bags by way of netting it against the cost of such bags. The Government contends that taxpayer's method of netting the cost of containers against the bag premium erroneously assumes that the premium charged is no greater than cost, and thus has the effect of leaving in income

19. If considered a direct non-mining expense, this would increase the denominator of the formula, supra, thus having a greater reducing effect in taxpayer's gross income from the property at kiln feed. We cannot consider these items direct non-mining costs since we have accepted taxpayer's expert's opinion concerning the point at which the mining-manufacturing processes cease. Supra, footnote 12.

20. See, infra, our discussion on item D.

21. Taxpayer's own experts state that these are distribution costs and not considered direct processing costs.

22. The cost of packing and loading bulk cement and the proportion of the total profits attributable to them must be taken out from the computation in the manner prescribed above. As to the manner in which the costs attributable to packing and loading cement bags are taken out, see our discussion of item D.

that portion of bag premiums which exceeds the cost of the containers.

▮ We agree with the Government's position and are of the opinion that the cost of the entire packing operation, including both the packing and loading into bags and the cost of containers, is the expense incurred in order to obtain the bag premium. Thus the entire amount of this expense must be eliminated from the computation for the same reason that packing and loading costs of bulk cement (and a percentage of the total profits attributable to them) must be excluded from the computation as an indirect cost which is not incurred for the benefit of the entire mining-manufacturing operation.

E. *Purchased Additives*

▮ Taxpayer has taken the position with respect to this cost item that their cost, as well as the profits attributable thereto (the profits being that portion of total profits which the tons of purchased additives bear to the total tons of processed materials) should be removed from gross income. On the other hand, the Government contends that the cost of purchased additives should be treated as a direct non-mining expense, no matter whether these purchased minerals are added prior to or subsequent to the kiln feed point,[23] and as such should not be eliminated from the computation.

We believe that these cost items should be segregated into two categories: (1) the cost of purchased additives added prior to kiln feed, (2) the cost of purchased additives introduced subsequent to kiln feed. The latter should be considered as a direct non-mining expense and should not be removed from the computation. We say this because these cost items are directly incurred for the benefit of the taxpayer's non-mining processes and as such should be a component part of taxpayer's total processing direct cost.

As to the former, we believe that they should be eliminated from taxpayer's gross income. Admittedly these costs are incurred prior to the cutoff point; however, we are here concerned with taxpayer's gross income from *mining* of limestone and shale in order to compute its proper depletion allowance, thus it should not be entitled to an allowance with respect to minerals which it does not mine. However, we cannot, as the Government contends, consider these items as direct costs incurred for the benefit of post-kiln feed processes since they are incurred in fact for the benefit of pre-kiln feed processes. Thus, the only solution available is to eliminate them from the entire computation. Taxpayer, in its computation, has eliminated these items and the profits attributable thereto on a tonnage basis. We cannot accept taxpayer's method since the adoption of this method would possibly result in a distortion of taxpayer's true gross income at kiln feed. The proportionate profits method is a cost oriented method and as such requires that all expenses and profits attributable thereto be expressed in terms of dollars and not in terms of weights. Thus in eliminating these cost items, the profits attributable thereto should also be eliminated from the total profit on the ratio which the cost of the purchased additives bears to the total cost of producing cement.

F. *Cost of Warehousing*

▮ Taxpayer contends that the cost of warehousing finished cement should be allocated to the pre-kiln feed processes in its computation of gross income from mining on the grounds that they are distribution expenses. We hold that these warehousing expenses are indirect costs (distribution) which cannot be allocated to the pre-kiln feed processes and as such should be eliminated (and the profits attributable thereto) from taxpayer's gross income, because these cost items are incurred long after the kiln feed cutoff point. Furthermore, these expenses were not incurred for the benefit of taxpayer's pre-kiln feed processes. Taxpayer has

---

23. At step (h) of taxpayer's operations, as set out in our findings of fact, small quantities of sand and iron ore are added to taxpayer's pre-kiln feed minerals.

already included as a mining expense the cost of storage incurred prior to the cut-off point.

G. *Inventory Adjustments*

Taxpayer, in its amended return, took into account *all* positive and negative inventory adjustments with respect to the materials utilized by it in the production of cement. The Government now agrees with this contention and has no objections to the making of inventory adjustments to these items as long as such adjustments are done in a manner consistent with prior accounting practices and are followed in future years.

Since at this stage of the proceedings we do not know whether taxpayer's depletion allowance based on "gross income from the property" at kiln feed computed in accordance with our opinion is greater than that which it took in its original return, entry of judgment is suspended and the case is remanded to the Commissioner for a computation of plaintiff's taxes for the period in issue in conformity with the above opinion.