**ARVONIA–BUCKINGHAM SLATE COMPANY, Inc., Appellant,**

v.

**UNITED STATES of America,
Appellee.**

No. 13923.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 2, 1970.

Decided May 22, 1970.

H. Brice Graves, Richmond, Va. (Lee F. Davis, Jr., and Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., on the brief) for appellant.

William S. Estabrook, III, Atty., Dept. of Justice (Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson and Grant W. Wiprud, Attys., Dept. of Justice, and C. Vernon Spratley, U. S. Atty., and Michael Morchower, Asst. U. S. Atty., on the brief) for appellee.

Before BRYAN, CRAVEN and BUTZNER, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

Federal income tax refunds of deficiencies assessed for the years 1964 and 1965 were sued for by Arvonia-Buckingham Slate Company, Inc., an integrated miner-manufacturer of slate. The dispute arises in the reckoning of the depletion allowance accorded Arvonia as a miner.[1] The applicable rates of depletion have been agreed upon here.

1. The applicable law is contained in the following sections of the Internal Revenue Code of 1954, 26 U.S.C. §§ 611(a), 613(a) and 613(c):

"§ 611. *Allowance of deduction for depletion*

(a) *General rule.*—In the case of mines, * * * [and] other natural

The sole item in controversy is the expense of advertising and selling the slate, that is, whether this cost should be assigned in part to mining processes in the computation of "gross income from the property". Sec. 613(a). The Government asserts, and the District Court held, that none of these expenditures could be included as a mining expense when fixing the gross mining income. Recovery lost, Arvonia appeals.

Arvonia is a Virginia corporation with its quarry in Buckingham County, Virginia. After extraction from the lode by blasting, the slate suitable for the purpose is moved to a shingle mill, approximately one mile from the rim of the quarry. Shingling is the cutting, squaring and hole-punching of the readiable blocks into shingle widths and lengths. Blocks of the best quality and greater dimensions are carried to a sawn edge mill, also located nearby. There they are cut into needed sizes and thicknesses, and are ground and polished. They are ordinarily to be used for building facings and structural purposes. The waste from the handling and treatment of the blocks is hauled to a crusher close-by, where it is reduced to one inch or less in size for use in road surfacing.

Advertisement and sale of all three of Arvonia's products are conducted almost exclusively through the Buckingham-Virginia Slate Corporation from its offices in Richmond. One-half of this company's capital stock is owned by Arvonia and the other by LeSueur-Richmond Slate Corporation, another slate concern in Virginia. The only function of Buckingham-Virginia is to market the products of its two stockholders, which it does under the registered name "Buckingham Slate". Thus, a customer ordering "Buckingham Slate" does not know whether Arvonia or LeSueur mined the slate.

Decision here begins with United States v. Cannelton Sewer & Pipe Co., 364 U.S. 76. 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960). The Court said, "Congress intended to grant miners a depletion allowance based on the constructive income from the raw mineral product, if marketable in that form, and not on the value of the finished articles". 364 U.S. at 86, 80 S.Ct. at 1586. See, too, Riddell v. Monolith Cement Co., 371 U.S. 537, 539, 83 S.Ct. 378, 9 L.Ed.2d 492 (1963). Thus, in determining "gross income from the property" pursuant to section 613 (a), an integrated miner such as Arvonia is limited to income from the min-

deposits * * *, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. * * *

"§ 613. Percentage depletion

(a) General rule.—In the case of the mines, wells and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified [as agreed] of the gross income from the property * * *. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). * * * [Accent added.]

(c) Definition of gross income from property.—For purposes of this section—

(1) Gross income from the property. —The term 'gross income from the property' means, in the case of a property other than an oil or gas well, the gross income from mining.

(2) Mining.—The term 'mining' includes not merely the extraction of the ores or minerals from the ground but also the treatment processes considered as mining described in paragraph (4) (and the treatment processes necessary or incidental thereto), and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which such treatment processes are applied thereto as is not in excess of 50 miles unless the Secretary or his delegate finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills."

ing segment of its operation, and a cut-off point between mining and nonmining processes must be established.[2] Because the litigants here have stipulated the points at which the mining process ends and the nonmining process begins for all three Arvonia products, inquiry in this regard is unnecessary.

It has also been stipulated by the parties that "[s]ince there is no representative or profitable market for the plaintiff's raw mineral, plaintiff's depletion allowance is computed by application of the proportionate profits method". See Treas.Reg. § 1.613–3(d) (1) (i) (1960, as amended 1968). This method is described in subparts (ii) and (iii) of the same subsection, reading in the related part as follows:

$$\frac{\text{Mining costs}}{\text{Total costs}} \text{[mining plus nonmining costs]} \times \text{Gross sales} = \text{Gross income from mining.}$$

[A2236]

"(ii) The proportionate profits method of computation is applied by multiplying the taxpayer's gross sales (actual or constructive) of his first marketable product or group of products * * * by a fraction whose numerator is the sum of all the costs allocable to those mining processes which are applied to produce, sell, and transport the first marketable product or group of products, and whose denominator is the total of all the mining and nonmining costs paid or incurred to produce, sell, and transport the first marketable product or group of products * *° *. The proportionate profits method of computation may be illustrated by the following equation:

"(iii) Those costs which are paid or incurred by the taxpayer to produce, sell, and transport the first marketable product or group of products, and which are *not directly identifiable with either a particular mining process or a particular nonmining process shall be properly apportioned to mining and to nonmining*. In the absence of any specific provision of this section providing an apportionment method, such costs shall be apportioned by use of a method which is reasonable in the circumstances. One method which may be reasonable in a particular case is an allocation based on the proportion that the direct costs of mining processes and the direct costs of nonmining processes bear to each other. * * *" [Accent added.]

Arvonia's contention is, and common knowledge supports it, that selling and advertising benefit both mining and nonmining activity. Further, it is argued that the costs of these items should be applied in equitable proportions to the two processes. These expenses, we think, are similar to general overhead expenditures. In our judgment, the costs of advertisement and sale in the present circumstances are "not directly identifiable with either a particular mining process or a particular nonmining process". Treas.Reg., supra, § 1.613–3(d) (1) (iii). Therefore, they should be apportioned in accordance with the mandate of this regulation. In this, we are restrengthened by United States v. California Portland Cement Co., 413 F.2d 161, 172 (9 Cir. 1969). Said the Court,

"Thus, we hold that if an expense is incurred for the benefit of the entire operation, as the district court found the selling expenses were in the present case, it can properly be allocated

2. The determination of the cut-off point between mining and nonmining processes has been the source of much litigation in this Circuit. Solite Corp. v. United States, 375 F.2d 684 (4 Cir. 1967);

Virginia Greenstone Co. v. United States, 308 F.2d 669 (4 Cir. 1962); Winnsboro Granite Corp. v. Commissioner of Internal Revenue, 283 F.2d 307 (4 Cir. 1960).

between mining and manufacturing. *See* Standard Lime & Cement Co. v. United States, *supra*, 329 F.2d at 948 [165 Ct.Cl. 180]. We further hold that the selling expenses in the instant case are to be allocated in the proportion that the mining costs bear to the total costs, in accordance with the finding and determination of the district court. This disposition finds further support in the decision in Whitehall Cement Mfg. Co. v. United States, 237 F.Supp. 838, 843–844 (E.D. Pa.1965), modified, 242 F.Supp. 327, 329 note 2, aff'd, 369 F.2d 468 (3d Cir. 1966). * * *"

Even more specifically, Treasury Regulation § 1.613–4(a) (1968) names "selling expenses" as a permissible deduction in determining taxable income as an item "attributable to the mineral property". Further it provides that "[e]xpenditures which may be attributable to both the mineral property upon which depletion is claimed and other activities shall be fairly apportioned". Thus, together with the preceding subpart, 1.613–3(d) (1) (iii), it is recognized that selling costs are properly considered in both calculations leading to the determination of the depletion allowance—in the reckoning of gross income from the property when resort is had to the proportionate profits method, and in computing taxable income.

Moreover, we cannot here simply discard the expenses of selling and advertising, and disregard their allocation between the mining and nonmining items in calculating gross income from the property. No matter how classified in the present milieu they are nonetheless costs of business and must be counted somewhere. For this reason we cannot follow United States v. Ideal Basic Indus., Inc., 404 F.2d 122 (10 Cir. 1968), cert. denied 395 U.S. 936, 89 S.Ct. 1997, 23 L.Ed.2d 451 (1969).

In allotting all of the advertising and selling expense to nonmining, and thus disallowing any consideration of them in computing mining costs, we think the District Court was mistaken. Its de-termination rested on the finding that these expenses were "not attributable" to mining, but rather went "directly towards its end products, i. e. that portion of plaintiff's operation which is classified as non-mining, and in no way are these expenses attributable to plaintiff's mining operations under § 1.613–3 (d) (1) (iii)". In our appraisal this determination was clearly erroneous in fact as well as in law.

The judgment on appeal must be vacated. The cause will be remanded to the District Court to determine the taxes payable by the plaintiff when the costs of advertising and selling are apportioned between the mining and nonmining activities. This division should be reasonably fashioned. Treas.Reg., supra, § 1.613–3(d) (1) (iii).

Vacated and remanded.