PORTLAND CEMENT CO. OF UTAH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Portland Cement Co. v. Commissioner
Docket No. 6306-73.
United States Tax Court
T.C. Memo 1977-137; 1977 Tax Ct. Memo LEXIS 304; 36 T.C.M. (CCH) 578; T.C.M. (RIA) 770137; May 9, 1977, Filed Glen E. Fuller and Jack R. Decker, for the petitioner. S. Clay Freed, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in petitioner's Federal income tax as follows: FYE
Deficiency
March 31, 1970
$44,200
March 31, 1971
41,509
March 31, 1972
7,175
The deficiencies pertain to petitioner's method of computing percentage depletion under *305 section 613. [1] Specifically, we are to decide whether petitioner has made a proper application of the proportionate profits method of determining gross income from mining. FINDINGS OF FACT Petitioner is a Utah corporation which maintained its principal place of business at Salt Lake City, Utah, when the petition herein was filed. For each of the years in issue it filed a corporate income tax return with the Western Service Center, Ogden, Utah. Petitioner is an integrated miner-manufacturer of Portland cement. It has for many years engaged in the quarrying of an argillaceous limestone rock, [2] known in the trade as cement rock, and in the processing of that rock into finished Portland cement. The manufacture of Portland cement begins with the mining of cement rock. Petitioner obtains cement rock from its own quarry located 12 miles from its Salt Lake City processing plant. The cement rock is first blasted free of the mountainous quarry face, then *306 pushed by bulldozer to the quarry floor. Secondary blasting is employed, if necessary, to further reduce the size of large boulders. The loose rock is then transported to "reduction" machinery where it passes through a jaw crusher and an impacter which further reduce the material to a size of less than one inch. The crushed material is stored temporarily at the quarry in bins awaiting loading into trucks for transportation to the processing plant. Arriving at the processing plant, the material is unloaded and placed in open stockpiles. The material is then fed into rod-ball mills which grind the rock to a fineness so that 75 percent volume passes through a 200 mesh sieve. During this grinding process, water is added to the powder and a "slurry," a very fine mud, is formed. The slurry is stored in tanks where it is continually agitated to maintain a uniform mixture. The mining phase of the operation concludes at this point. During the manufacturing phase, the liquid slurry is fed into rotary kilns and burned. The heat of the kiln expells moisture from the material and converts carbonates to oxides. As the material is heated to a point of incipient fusion, complex silicates *307 and aluminates are formed by chemical reactions occurring inside the kiln. The result of the burning process is a hard, glass-like "clinker." The clinker is cooled and later ground with purchased gypsum to produce finished cement. The rock in taxpayer's quarry varies in chemical composition. Certain areas within the quarry do not contain all the ingredients necessary to produce finished Portland cement. When rock is quarried from these areas it becomes necessary to add to the cement rock supplementary chemical materials. The various chemical supplements are added to the cement rock during the grinding phase in the rod-ball mill. High lime rock is added to correct any calcium carbonate deficiency in the quarried rock; iron slag is added to correct any iron deficiency; silica is added to compensate for lacking silica oxides. If the required amounts of calcium carbonates, iron and silica oxides are not present in the slurry as it is introduced into the kiln, chemical actions required to produce a clinker from which Portland cement can be made will not occur. It is only when the proper proportions of materials are introduced into the rod-ball mill that the necessary chemical reactions *308 will take place during the burning in the kilns. Frequent chemical analyses are made by petitioner's chemists to ensure that the slurry is of a proper composition for making Portland cement. After final grinding, finished cement is placed in storage silos to await sales to customers. Petitioner's finished cement is sold in two ways. Most of petitioner's output is sold in bulk in tank cars, loading directly from the storage silos. A small portion of the output is run from the storage silo into a bin above a bagging machine where it is sealed in paper bags and thereafter sold in that form. [3]
OPINION In computing the amount of its gross income from mining, a component necessary to arriving at its percentage depletion allowance for the years in issue, petitioner utilized the proportionate profits method of computation. *309 See sec. 613.
According to the regulations: The proportionate profits method of computation is applied by multiplying the taxpayer's gross sales * * * of his first marketable product or group of products * * * by a fraction whose numerator is the sum of all the costs allocable to those mining processes which are applied to produce, sell, and transport the first marketable product or group of products, and whose denominator is the total of all the mining and nonmining costs paid or incurred to produce, sell, and transport the first marketable product or group of products * * *. The method as described herein is merely a restatement of the method formerly set forth in the second sentence of Regulations 118, § 39.23(m)-1 (e)(3) (1939 Code). The proportionate profits method of computation may be illustrated by the following equation: Mining Costs Total Costs X Gross Sales = Gross Income from Mining. [Sec. 1.613-4(d)4(ii), Income Tax Regs.; emphasis supplied.] [4]
*310 The controversy in this matter centers on the costs which constitute "total costs" in the above formula.The resolution of this question depends in turn upon the meaning of the term "first marketable product" as stated in the regulation. Petitioner sells finished cement both in bulk and in bags. Since the difference between the bulk and bagged price does not exceed the cost of the bags and bagging, petitioner would have a greater depletion base if the proportionate profits computation were applied to the value of its bulk cement, and the bags and bagging costs entirely excluded from the formula. On its Federal income tax returns for the years in issue, petitioner took the position that bulk cement, rather than cement in bags, constituted its first marketable product, and applied the formula accordingly in computing its depletion deduction. Respondent, on the other hand, would have us include the costs of bags and bagging in the "total costs" portion of the formula, thereby decreasing the ultimate amount of "gross income from mining" and the corresponding depletion deduction. Additionally, respondent would further include in the formula the costs incurred in selling, shipping, *311 and storing, along with the indirect costs attributable to these activities. The taxpayer in this case maintains its principal place of business in Salt Lake City, Utah, and, therefore, an appeal of the decision herein would lie in the Tenth Circuit. The Court of Appeals for the Tenth Circuit previously considered this issue in United States v. Ideal Basic Industries, Inc.,404 F.2d 122 (10th Cir. 1968). [5]
In that case the court held bulk cement to be the first marketable product, stating at pages 125-126: We conclude that "first marketable product" is the proper sales price to which the application of the formula was intended, therefore, the cost of bags, bagging, and bulk loading should be eliminated from all parts in the formula. "Consequently we must hold that those *312 packing and loading costs are indirect costs which are not incurred for the benefit of the entire operation and as such cannot be included in taxpayer's computation of gross income from the property at kiln feed." Standard Lime & Cement Co. v. United States, 329 F.2d 939, 948165 Ct. Cl. 180 (1964) (emphasis added); accord, United Salt Corp., 40 T.C. 359 (1963). Equally compelling is the simple logic that bulk cement is the first marketable product, [2] bagged cement is the second marketable product, as for example "sakrete" [3] would be a third marketable product. In the present case petitioner contends simply that we are bound by this holding pursuant to the rule set forth in Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). Respondent, relying on the holdings in Commissioner v. Sunnen,333 U.S. 591 (1948), and CBN Corporation v. United States,364 F.2d 393 (Ct. Cl. 1966), *313 cert. denied 386 U.S. 981 (1967), contends that certain amendments to the pertinent regulations adopted subsequent to the Tenth Circuit's decision in Ideal Basic have worked a change in the legal atmosphere sufficient to cause the Tenth Circuit to re-examine their previously expressed position. As such, he argues, the Tenth Circuit's position insofar as we are concerned is no longer a foregone conclusion and the Golsen rule is therefore inapplicable in this instance. Thus, at this point, it becomes our task to determine the extent, if any, by which the regulation changes have affected the definition of the term "first marketable product." In 1972 the sections of the regulations dealing with the proportionate profits method of computation were revamped.At that time the main definitional portions of the regulations describing the proportionate profits method were carried over intact. Several new portions, however, were added.
In support of his position herein, respondent relies principally on the following language, added subsequent to the Ideal Basic decision, contained in section 1.613-4(d) (3)(iii)(a), Income Tax Regs.: *314 (iii) In determining gross income from mining by use of methods based on the taxpayer's costs-- (a) The costs attributable to containers, bags, packages, pallets, and similar items as well as the costs of materials and labor attributable to bagging, packaging, palletizing, or similar operations shall be considered as nonmining costs. Since this addition specifically states that the costs of bags and bagging are to be treated as nonmining costs, respondent concludes that such costs are now necessarily includable in the formula as an element of "total costs" rather than being eliminated entirely as the Tenth Circuit directed in Ideal Basic. Respondent's view, however, overlooks a pivotal consideration. Notwithstanding the new regulation's specific mention of bags and bagging costs, such additional language does not purport to alter the definition of the makeup of the elements which constitute the first marketable product. [6] Rather, such change merely clarifies the classification among certain costs which are common to almost all integrated mining-manufacturing operations. [7] *315 Thus, once bulk cement is determined to be the first marketable product, the costs of bags and bagging become an element of producing a second marketable product--bagged cement; hence, these costs are of no consequence in determining gross income from the sale of the first marketable product. Given the fact that in the Tenth Circuit's view, bulk cement--the first marketable product--is produced before the bagging process commences, the amended regulation's mere reference to such bagging costs does not support respondent's claim for mandatory inclusion in the formula. With regard to storing, shipping, and selling costs involved in the present case, the result is the same. As further stated in Ideal Basic: The advertising, promotional, and selling costs are not a proper part of the computation These costs, like bagging (packing) *316 and loading costs are overhead charges properly applicable to finished cement after it has become "first marketable product." * * * Similarly, the court directed that the costs of operating storage warehouses and distribution terminals and the transportation en route be eliminated from the formula. 404 F.2d at 126. We conclude that the issue herein was fully aired and decided by the Tenth Circuit in Ideal Basic,supra.[8] The premise underlying that decision remained unaffected by the regulation change. We are therefore bound to follow that decision in accordance with the requirements of Golsen v. Commissioner,supra.
To reflect the foregoing conclusions, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. Referred to as "calcium carbonates" or "limestone" in sec. 613(b)(7), I.R.C. 1954↩.
3. The parties have agreed upon the amounts of most of the expenses that are required in computing petitioner's depletion deduction. Since this controversy involves the application of the depletion computation, a recital of these amounts would not furnish an aid to an understanding of this case. Accordingly, they are not set forth in our findings of fact.↩
4. The depletion regulations are legislative in nature, having the force and effect of law. Sec. 611(a)↩.
5. See also Portland Cement Company of Utah v. United States,412 F.2d 894 (10th Cir. 1969), in which the Tenth Circuit followed United States v. Ideal Basic Industries, Inc.,404 F.2d 122↩ (10th Cir. 1968), in a subsequent case involving the petitioner herein on the identical issue.
2. Bulk cement is the first marketable product because it can↩ be sold. * * * 3. "Sakrete" is a bagged mixture of cement, sand, and gravel to which water may be added to make concrete.↩
6. Sec. 1.613-4(d)↩4(iv), which defines the term "first marketable product," was transferred completely intact from the old to the new regulatory material. 7. Indeed, the Tenth Circuit takes no issue with the view that the cost of bags and bagging constitutes nonmining expenses. See Ideal Basic Industries,supra↩ at 125.
8. This case marks petitioner's sixth round in depletion-related litigation. See Portland Cement Company of Utah v. United States,412 F.2d 894 (10th Cir. 1969); United States v. Portland Cement Company of Utah,378 F.2d 91 (10th Cir. 1967); 338 F.2d 798 (10th Cir. 1964); 315 F.2d 169 (10th Cir. 1963); 293 F.2d 826↩ (10th Cir. 1961).