MONSANTO COMPANY AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 22597-81.         Filed June 18, 1986.

*James F. Gordy*, for the petitioner.
*James F. Kidd*, for the respondent.

SWIFT, *Judge*: By notice of deficiency dated June 11, 1981, respondent determined deficiencies in petitioner's Federal income tax liabilities for the years 1975 and 1976 in the total amount of $2,052,613 ($1,479,982 for 1975 and $572,631 for 1976). In its timely filed petition, petitioner disputed $1,967,757 of the total deficiencies for both years, and petitioner also claimed refunds in the total amount of $3,226,786. By amendment to its petition, petitioner made a protective claim for additional refunds in the total amount of $5,307,777. The protective refund claims made in the amended petition relate to excess foreign tax credit carrybacks from 1978. After settlement of some issues, the issue for decision concerns the proper method of computing the percentage depletion allowances to which petitioner is entitled with respect to its production of elemental phosphorous.

FINDINGS OF FACT

Many of the facts have been stipulated and are so found.

Monsanto Co. (Monsanto) is a corporation organized under the laws of Delaware. It maintains its office and principal place of business in St. Louis, Missouri. Monsanto is a multinational company engaged directly and through its subsidiaries in the manufacture and sale of a diversified line of chemicals, plastics, fibers, and other products derived from petroleum, natural gas, and phosphate rock.

Monsanto mines phosphate rock and processes it into elemental phosphorous at two plants that are located in Columbia, Tennessee (hereinafter referred to as the Columbia Plant) and Soda Springs, Idaho (hereinafter referred to as the Soda Springs Plant). The plants were designed and are operated to integrate the mining and manufacturing processes of the production of elemental phosphorous. There is no commercial market for unprocessed phosphate rock in the United States. Monsanto, which annually produces approximately 180,000 tons of elemental phosphorous, is one of the largest producers of elemental phosphorous in the western world. All four domestic miners of phosphate rock (Monsanto, Occidental Chemical Co., Stauffer Chemical Co., and FMC) have integrated their mining of phosphate rock with their manufacturing of elemental phosphorous.

Monsanto's Columbia Plant began operating in 1937. Initially, the manufacturing process of its operation was conducted with three electric furnaces. The plant's capacity was increased in 1941, 1950, and 1951 with the installation of three additional electric furnaces, making a total of six furnaces. Since 1951, the capacity of individual furnaces has been increased with the last major increase being made in 1965. The Columbia Plant annually processes approximately 1,100,000 tons of phosphate rock, producing approximately 95,000 tons of elemental phosphorous.

The Soda Springs Plant began operating in 1952. Initially, the manufacturing process of its operation was conducted with one electric furnace. The plant's capacity was increased in 1954 and 1966 with the construction of two additional furnaces. The Soda Springs Plant annually processes approximately 975,000 tons of phosphate rock, producing approximately 85,000 tons of elemental phosphorous.

Set forth on page 1235 is a flow chart which diagrams generally the steps for processing phosphate rock at Monsanto's Columbia and Soda Springs Plants.

The process by which elemental phosphorous is derived from phosphate rock begins by extracting the rock from open pit mines. Phosphate rock in the ground has approximately 9 to 13 percent phosphorous content. After extraction from the ground, the two primary processes through which phosphate rock must pass to produce elemental phosphorous are the nodulizing process and the furnacing process. The nodulizing process is a method by which phosphate rock is fused together or "agglomerated" to form larger rock clusters.

Electric smelting furnaces for the production of elemental phosphorous operate most efficiently when the phosphate rock that is fed into the furnaces is reasonably uniform in size and has the necessary strength to withstand mechanical and thermal shock. Phosphate rock introduced into the furnaces also must be in a form that provides adequate porosity to permit the rapid release of gaseous substances from the reaction zone in the furnaces.

Because phosphate rock is a fine material, it must be agglomerated to achieve the desired uniformity in size and the desired porosity. Such treatment is essential to the economic and operational feasibility of the electric furnacing process, which actually produces the elemental phosphorous. In the United States, the most common methods of accomplishing the necessary agglomeration of phosphate rock prior to furnacing are referred to as the nodulizing and sintering of phosphate rock. Briquetting or pelletizing are less common methods of agglomerating phosphate rock.[1]

At Monsanto's Columbia and Soda Springs Plants, the agglomeration of phosphate rock is accomplished through nodulizing the rock in kilns prior to feeding it into the furnaces. At the Columbia Plant, the rock is processed through washing facilities which remove undesirable clay and iron oxides. The washed phosphate rock is then blended

---

[1] Briquetting uses only pressure to bind or mold phosphate rock into briquettes or small brick-shaped lumps. Pelletizing uses a procedure similar to briquetting or, in some instances, rolling in a drum to form pellets, which are smaller than briquettes

# ELEMENTAL PHOSPHORUS PRODUCTION AT THE COLUMBIA, TENNESSEE, AND SODA SPRINGS, IDAHO, PLANTS

with kiln dust, pond solids, and nodule fines[2] (which have been recycled from the kilning process), to obtain the desired phosphate rock content and is fed into the kilns.

At the Soda Springs Plant, the phosphate rock does not need to be washed. It is delivered directly from the mine to the processing plant where it is blended with other stock-piled phosphate rock and fed into the kilns. The blended phosphate rock fed into the kilns is composed of rock fragments 3 inches in length and smaller.

The nodulizing kilns are inclined, rotating steel cylinders, lined with refractory brick, which range from 11 to 15 feet in diameter and are 300 to 325 feet in length. The Columbia Plant has three nodulizing kilns, and the Soda Springs Plant has one nodulizing kiln. The kilns rotate at a rate of three to four revolutions per minute. A kiln normally operates continuously, unless it is shut down for repairs or maintenance. The Columbia Plant can process a total of 100 to 250 tons of phosphate rock per hour in its kilns. The Soda Springs Plant can process 150 to 200 tons of phosphate rock per hour in its kiln.

The phosphate rock enters at the higher end of the kilns. Once inside the kilns, the phosphate rock gradually tumbles down to the lower end of the kilns. As it does so, applied heat causes the rock particles to bind together.[3] The heat source in the kilns is provided by a nozzle located at the center of the lower end of the kilns through which fuel composed of combustible gas—either carbon monoxide (here-inafter referred to as CO gas), natural gas, or both—and powdered coal are jetted under pressure. The gas and coal are ignited as they pass through the nozzle into the kilns, creating a flame of approximately 2,000 degrees centigrade. The resulting temperature in the kilns is approximately 1,250 degrees centigrade, which causes the phosphate rock to "agglomerate" or to form small clusters of rock frag-ments that are partially fused together.

---

[2] Kiln dust is phosphate rock particles that are blown out of the kiln during kilning. Pond solids are kiln dust material captured in kiln dust collectors, transferred to waste ponds where they settle as the ponds evaporate and become available for excavation. Nodule fines are fragments of the nodules produced by kilning that are too small for furnacing.

[3] The binding effect is technically referred to as "incipient fusion," i.e., a partial melting together of phosphate rock fragments.

The product produced at the lower end of the kilns is nodulized phosphate rock, ranging in size from 1/4 inch to 10 inches in diameter. It takes approximately 30 minutes for phosphate rock to pass through the nodulizing process and to exit the kilns at the lower end.

The fuel used to produce the heat in the kilns to accomplish the nodulizing process is a gas fuel in combination with a finely divided solid fuel. The gas fuel used can be natural gas, CO gas, or other combustible gases.[4] Based on equipment design and economic and operational feasibility, gas fuels are used in the kilns because of their thermal efficiency and their ability to provide even distribution of heat throughout the kilns. If only powdered coal were used as a fuel in the kilns, more air would be required, which when ignited in the kilns would blow some of the phosphate rock fines from the kilns before being nodulized. The use of combustible gases with powdered coal significantly decreases this problem.

Either natural gas or CO gas or both may be used with powdered coal to fuel the kilns at the Columbia and Soda Springs Plants. At both the Columbia and the Soda Springs Plants, CO gas generally is used as the combustible gas. Both plants have operated for short, emergency periods with natural gas as a substitute for, or in combination with, CO gas. Neither plant ever commercially has operated its kilns using only powdered coal. To do so would require modification of the kilns, at a cost of at least $250,000 per kiln and an increase of the coal mill capacity at the plants. Additional costs also would be incurred to retrofit the kilns to decrease the amount of phosphate rock fines lost from the kilns as a result of coal combustion. The CO gas that is used as a fuel in the kilns combines in the kilns with additional oxygen and forms carbon dioxide gas ($CO_2$) and is vented out of the kilns into the atmosphere.

It is general industry practice at integrated mining and manufacturing phosphorous plants to fuel the nodulizing kilns in part by CO gas that is produced in the adjacent furnaces. The manner by which CO gas is produced in the

---

[4] The solid fuel used is a combination of powdered coal and a small amount of coke fines (coke particles approximately 1/8 inch in size).

furnaces will be explained later in these findings. All electric furnace phosphorous plants, of which there are six operating in the United States, are designed to facilitate the use in the kilns of the CO gas that is produced in their furnaces.

During 1975 and 1976, the fuel for the nodulizing kilns at the Columbia and the Soda Springs Plants was supplied by the following substances in the approximate amounts indicated:

|             | Columbia Plant | | Soda Springs Plant | |
|             | 1975 | 1976 | 1975 | 1976 |
|-------------|--------|--------|--------|--------|
| CO gas      | 51.52% | 52.91% | 72.21% | 56.22% |
| Natural gas | .02%   | - - -  | 4.51%  | 9.76%  |
| Coal        | 48.46% | 47.09% | 23.28% | 34.02% |
| Coke fines  | <.01%  | <.01%  | <.01%  | <.01%  |

As they leave the kilns, phosphate nodules are sized by a screening or filtering process and are transferred on conveyor belts to the electric furnaces. Phosphate rock fines too small to process in the furnaces are recirculated back to the kilns' feed stream for retreatment in the kilns.

Prior to entering the electric furnaces, phosphate nodules are blended with coke and silica[5] in the proper ratios and this mix of ingredients (referred to as the furnace burden) is deposited into bins above the smelting furnaces. The coke contains carbon which serves as a reduction agent in the furnaces. In the presence of heat, carbon molecules in the coke chemically attract or free elemental phosphorous from the nodulized phosphorous rock by attracting oxygen molecules. The silica serves as a flux, which ensures that the slag produced in the reaction flows properly and has the most advantageous melting point and electrical conductivity.

The electric furnaces at the Columbia and Soda Springs Plants are cylindrical structures that are approximately 25 feet in diameter and 15 feet in height. Heat is provided by electric power which is introduced into the furnaces through three large carbon or graphite electrodes, approximately 300 to 360 inches in length and 45 to 55 inches in diameter,

---

[5] The Soda Springs Plant used silica in the form of quartzite. The Columbia Plant used silica in the form of gravel.

which extend down through the ceiling of the furnaces into the reaction zone of the furnaces. The electrodes convey approximately 30,000 to 60,000 kilowatts of electric power which produce temperatures of approximately 3,000 degrees centigrade in the reaction zone (i.e., at the arc point where the electrodes are closest to the furnace burden).

Inside the electric furnaces the burden material is heated to a molten state. This causes chemical reactions to occur, releasing elemental phosphorous in gaseous form from the phosphate nodules. The extreme temperatures cause most of the carbon that is contained in the coke and in the electrodes (if carbon electrodes are used) to combine with the oxygen molecules that are released from the nodules of phosphate rock and to form CO gas. The volume of CO gas produced in the furnaces may vary depending on the quality and proportionate mix of the furnace burden.

A mixed furnace gas containing elemental phosphorous and CO gas rises to the top of the furnaces and exits through a single central pipe. The mixed furnace gas as it exits the furnaces is approximately 300 to 400 degrees centigrade and contains 90- to 95-percent CO gas. The balance of the furnace gas is elemental phosphorous with traces of dust and other impurities. The furnace gas is treated to remove the impurities. The elemental phosphorous also is removed, cooled, and sent to condensers, where it is converted into a liquid for collection and storage in tanks.

When elemental phosphorous and impurities are removed from the furnace gas, heated CO gas remains which is transmitted by a pipeline, approximately 36 inches in diameter and 800 feet long, to the kilns, where (as previously explained) it is used as the primary fuel for the nodulizing process. The actual transmission is accomplished by electric-driven blowers which create pressure in the pipeline. The use of CO gas as a fuel in the nodulizing kilns benefits the operation of the kilns because it is the most effective combustible gas fuel, and the Columbia and Soda Springs Plants were designed to use CO gas. The same application is employed at other phosphorous manufactur-

ing facilities in the United States which use the electric furnace process.

The electric furnaces also produce ferrophosphorous (an iron and phosphorous compound) and slag. Both of these products are retained in the furnaces in a molten state until predetermined amounts have accumulated, at which time tapping holes on the sides of the furnaces are opened, and the molten ferrophosphorous and slag are allowed to flow from the furnaces and are cooled. Those products are then placed in stockpiles for future use or sale to customers.

Except for short-term emergencies requiring closing of the furnaces, Monsanto does not operate the nodulizing kilns when the electric furnaces are not operating. Usually, CO gas is the predominant or exclusive gas burned in the kilns with powdered coal. As a supplementary fuel, natural gas is burned in the kilns only when the amount of CO gas available from the furnaces is insufficient or when CO gas is temporarily not available at all due to inoperation of the furnaces.

Monsanto designed the overall processes at the Columbia and Soda Springs Plants on the assumption that CO gas would constitute a large part of the fuel burned in the kilns. At the Columbia and Soda Springs Plants, natural gas is available from a public utility company and is used as a fuel to operate the coke dryer, the steam plant, and the treater jackets on the furnaces.

At both the Columbia and Soda Springs Plants, Monsanto conducts testing during various stages of the production process to ensure the proper mix of materials. The content of the phosphorous nodules produced by the kilns is analyzed every four hours by X ray and wet chemical processes to determine the content of phosphorous rock and other materials. Monsanto determines the amount of CO gas used in the kilns through monitoring devices located in the kilns. In the absence of CO gas, Monsanto would incur additional costs to provide the fuel necessary to operate the kilns.

Testing also is performed on the coke and silica introduced into the furnaces. This testing includes measurements of the amount of carbon contained in the coke that is fed into the furnaces.

Additionally, the slag that results from the furnace operation is tested every 4 hours by obtaining samples from slag taps on each furnace. The purpose of the testing in the furnaces is to ensure that materials fed into the furnaces—composed of phosphate nodules, coke, and silica—contain the correct balance of ingredients to react in the furnaces in the most efficient manner. The content of the furnace burden is maintained by means of a computerized quality control process. Monsanto does not use coke or carbon electrodes in the furnacing process in excess of that necessary to accomplish the reduction process.

Since 1957, Monsanto has on its Federal corporate income tax returns divided the costs of carbon (i.e., the costs of the coke and of the carbon in the electrodes) between mining and nonmining activities for purposes of applying the proportionate profits formula for determining gross income from mining in the computation of the percentage depletion allowances to which it is entitled. On Monsanto's tax returns for 1957 through 1982, Monsanto determined the share of carbon costs attributable to mining on the basis of the substituted fuel method. Under such method, the portion of the total carbon costs allocated to mining costs was determined by the cost of the amount of coal that would have been required to produce the same amount of heat (measured by British Thermal Units (BTU's)) as the amount of heat that was produced by the CO gas actually used in the kilns. The balance of the carbon costs was included in furnacing or nonmining costs.

During the years 1957 through 1982, Monsanto has for financial accounting purposes divided its carbon costs between mining and nonmining processes in the same manner that it treated such costs on its tax returns. As a result, Schedule M of Monsanto's tax returns during the period 1957 through 1982 reflected no adjustments with respect to the treatment of its carbon costs.

Monsanto timely filed consolidated corporate income tax returns for the taxable years ended December 31, 1975, and December 31, 1976, with the District Director, Internal Revenue Service, St. Louis, Missouri. Such returns were prepared under the accrual method of accounting.

OPINION

*Allocation of Carbon Costs*

Under section 611(a)[6] a deduction is allowed with respect to depletion of specified minerals and natural deposits.[7] The amount of the depletion deduction, under section 613(a), (b), and (c), is computed as a percentage of the gross income from a particular mining activity. Section 613(c)(4)(E) states expressly that, "the sintering and nodulizing of phosphate rock" is to be treated as a mining activity, and section 613(b)(7) provides that the depletion percentage with respect to "phosphate rock" shall be 14 percent.

Regulations under section 613 establish detailed rules that govern the computation of gross income from mining activities. Taxpayers who, in addition to mining activities, conduct nonmining activities with respect to mineral properties (such as the manufacture of finished products) must make an allocation between gross income from the mining activity and gross income from the nonmining activity so that the percentage depletion factor can be applied only to the gross income from the mining activity. Sec. 1.613-4(a), Income Tax Regs. Under the general rule that applies in such a situation, gross income from the mining activity is computed on the basis of the representative market or field price of the particular mineral being processed. Sec. 1.613-4(c), Income Tax Regs. Where a representative market or field price for a particular mineral property cannot be ascertained, the proportionate profits method of computing gross income from the mining activity shall be used unless

---

[6] All section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

[7] Sec. 611(a) provides as follows:

SEC. 611. ALLOWANCE OF DEDUCTION FOR DEPLETION.

(a) GENERAL RULE.—In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. For purposes of this part, the term "mines" includes deposits of waste or residue, the extraction of ores or minerals from which is treated as mining under section 613(c). In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this section for subsequent taxable years shall be based on such revised estimate.

permission to use an alternative method of computation is obtained from respondent. Sec. 1.613-4(d), Income Tax Regs.

The proportionate profits method of computing gross income from mining is based on a determination of the taxpayer's total mining and nonmining costs. Once determined, the ratio of mining costs to total mining and nonmining costs is applied to the total gross income from the taxpayer's combined mining and nonmining activities with respect to the mineral property. The product therefrom is treated as the gross income from the mining activity against which the depletion percentage is applied. Section 1.613-4(d)(4)(ii), Income Tax Regs., reflects the formula for the proportionate profits method as follows:

$$\frac{\text{MINING COSTS}}{\text{TOTAL COSTS}} \times \text{GROSS SALES} = \frac{\text{GROSS INCOME}}{\text{FROM MINING}}$$

The governing regulation states the objective of the proportionate profits method and explains the formula to be used as follows:

(4) *Proportionate profits method.* (i) The objective of the "proportionate profits method" of computation is to ascertain gross income from mining by applying the principle that each dollar of the total costs paid or incurred to produce, sell, and transport the first marketable product or group of products (as defined in subdivision (iv) of this subparagraph) earns the same percentage of profit. Accordingly, in the proportionate profits method no ranking of costs is permissible which results in excluding or minimizing the effect of any costs incurred to produce, sell, and transport the first marketable product or group of products. For purposes of this subparagraph, members of a controlled group shall be treated as divisions of a single taxpayer. See paragraph (j) of this section for the definitions of the terms "controlled" and "group." [Sec. 1.613-4(d)(4)(i), Income Tax Regs.]

The regulations also provide that where the gross income from mining is to be computed on a method based on the taxpayer's costs, as is the case with the proportionate profits method, only actual costs are to be considered. Also, apparently recognizing cost allocation problems that an integrated miner-manufacturer would have to face, the regulations provide that where the taxpayer consistently has used a reasonable method of allocating its costs between various phases of its mining and nonmining activities, such an allocation method will be accepted. The

consistent use of a method of allocating costs for tax and financial purposes will be a factor in determining whether that method is reasonable. Section 1.613-4(d)(2), Income Tax Regs., provides as follows:

(2) *Costs to be used in computing gross income from mining by use of methods based on the taxpayer's costs.* In determining the taxpayer's gross income from mining by use of methods based on the taxpayer's costs, only costs actually paid or incurred shall be taken into consideration. In general, if the taxpayer has consistently employed a reasonable method of determining the cost of the various individual phases of his mining and nonmining processes (such as extraction, loading for shipment, calcining, packaging, etc.), such method shall not be disturbed. The amount of any particular item to be taken into account shall, for taxable years beginning after November 30, 1968, be the amount used in determining the taxpayer's income for tax purposes. For example, the depreciation lives, methods, and records used for tax purposes, if different from those used for book purposes, shall be the basis for determining the amount of depreciation to be used. However, a taxpayer may continue to use a reasonable method for determining those costs on the basis of the amounts computed for cost control or similar financial or accounting books and records if that method has been used consistently and is applied to the determination of all those costs.[8]

The parties herein do not dispute that expenses relating to the nodulizing of phosphate rock qualify as mining expenses. They do, however, disagree as to whether a portion of Monsanto's carbon costs properly can be allocated to the CO gas that functions as the primary fuel for the nodulizing process, with the result that it is treated as a cost of that process and therefore as a mining cost. Monsanto asserts that the carbon costs allocated each year to the CO gas actually were incurred, that they were incurred for the benefit of the nodulizing process, that Monsanto consistently and for many years has allocated its

---

[8] See also sec. 1.613-4(d)(4)(iii), Income Tax Regs., which provides, in part, as follows—

(iii) Those costs which are paid or incurred by the taxpayer to produce, sell, and transport the first marketable product or group of products, and which are not directly identifiable with either a particular mining process or a particular nonmining process shall, in the absence of a specific provision of this section providing an apportionment method, be apportioned to mining and to nonmining by use of a method which is reasonable under the circumstances;

        *       *       *       *       *       *       *

and sec. 1.613-5(a), which provides, in part, as follows:

Taxable income from the property.

(a) *General rule.—* * * * Expenditures which may be attributable both to the mineral property upon which depletion is claimed and to other activities shall be properly apportioned to the mineral property and to such other activities. * * *

costs of carbon between its mining and nonmining activities to reflect the fact that carbon is used in both activities, and that it has made such allocations for both tax and financial. purposes. Monsanto also asserts that the failure to allow such an allocation would result in an integrated phosphate rock miner-manufacturer being treated differently than would a nonintegrated miner of phosphate rock.

Respondent asserts that no allocation should be allowed of any portion of Monsanto's carbon costs to the fuel that is used in the nodulizing kilns. Respondent argues primarily that petitioner incurs no actual costs to acquire the CO gas it uses as the primary fuel in the kilns.[9] Additionally, respondent asserts that if an allocation is to be allowed, the method that petitioner has used and the alternative methods it now seeks to use are improper.

Prior to an analysis of the contentions of the parties, it is helpful to review a number of the many court decisions that have discussed the computation of gross income from mining and the allocation of costs between mining and nonmining activities of an integrated miner-manufacturer. In *United States v. Cannelton Sewer Pipe Co.*, 364 U.S. 84 (1960), an integrated miner-manufacturer of vitrified clay products argued that its total income from the sale of its first finished product should be treated as gross income from mining because it operated its mining and manufacturing activities as one integrated process. The Supreme Court rejected that argument and established the principle that integrated miner-manufacturers of a particular depletable mineral property must compute their depletion allowances on the same basis as nonintegrated miners of the same mineral property. The Supreme Court explained that—

Depletion, as we have said, is an allowance for the exhaustion of capital assets. It is not a subsidy to manufacturers or the high-cost mine operator. The value of [the taxpayer's] vitrified clay products, obtained by expressive manufacturing processes, bears little relation to the value of its minerals. [364 U.S. at 86.]

The Court then explained that integrated miner-manufacturers are to have no competitive advantage over nonintegrated miners or over nonintegrated manufacturers

---

[9] Respondent's position is reflected in Rev. Rul. 84-36, 1984-1 C.B. 143.

through the computation of depletion allowances. Conversely, integrated miner-manufacturers are to have no competitive disadvantage compared to nonintegrated miners or manufacturers as a result of the computation of the depletion allowance. To accomplish the desired parity, the miner-manufacturer is to be regarded as, "but selling to himself the crude mineral that he mines, insofar as the depletion allowance is concerned." 364 U.S. at 87. The Supreme Court stated further that—

All processes used by the nonintegrated miner before shipping the new fine clay and shale would under such a formula be available to the integrated miner-manufacturer to the same extent, but no more. [364 U.S. at 89.]

That approach uniformly has been adopted by the courts that subsequently have addressed this issue in the context of the operations of an integrated miner-manufacturer. See, for example, *Virginia Greenstone Co. v. United States*, 308 F.2d 669, 670 (4th Cir. 1962); *United States v. Light Aggregates, Inc.*, 343 F.2d 429, 431-432 (8th Cir. 1965); *Solite Corp. v. United States*, 375 F.2d 684, 686 (4th Cir. 1967); *North Carolina Granite Corp. v. Commissioner*, 56 T.C. 1281, 1286-1287 (1971); *Commissioner v. Portland Cement Co. of Utah*, 450 U.S. 156, 169 (1981).

In *Standard Lime & Cement Co. v. United States*, 165 Ct. Cl. 180, 329 F.2d 939 (1964), the Court of Claims considered the computation of the depletion allowance with respect to limestone and shale rock in the context of an integrated miner-manufacturer using the proportionate profits formula to determine gross income from mining. The Court of Claims reiterated that, "we must view the miner-manufacturer as selling to himself the processed minerals," and that, "To view this in any other perspective would introduce the tax discrimination between integrated and non-integrated miners against which the whole tenor of the *Cannelton* decision was directed." 165 Ct. Cl. at 193, 329 F.2d at 946-947. The court considered the allocation between mining and nonmining activities of the costs of interplant overhead, cash discounts, packing and loading containers, chemical additives, and warehousing. The test enunciated for its decision as to whether particular costs

could be allocated, in whole or part, to the mining activity was whether the costs were "incurred for the benefit [in whole or in part] of the mining operation as particularized by the statutory scheme" (165 Ct. Cl. at 192, 329 F.2d at 946), and whether there was a "functional relationship" between the costs in question and the mining operation. 165 Ct. Cl. at 196, 329 F.2d at 948.

The discussion by the Court of Claims in *Standard Lime & Cement Co.* of cash discounts is of some particular interest to the instant case. The Government made the argument therein, similar to the argument herein, that the cost of the cash discount could not be allocated to the mining operation because it technically was incurred after the end of the mining operation. The court held that the cash discount was an "expense which is incurred for the benefit of both stages of the production process since it is obvious that working capital is needed for both the mining and manufacturing processes," and that it was "incurred for the benefit of the entire operation and as such can be properly allocated" between the mining and nonmining operation. 165 Ct. Cl. at 194-195, 329 F.2d at 948.

Based upon our careful examination of the statutory and regulatory scheme and of the relevant case authority, and based on a close scrutiny of the relevant facts, we conclude that a portion of Monsanto's costs of carbon (in the form of coke and carbon electrodes) must be allocated to the costs of petitioner's mining activity with respect to phosphate rock. The coke was purchased for its carbon content. The intended use of the carbon by Monsanto at all times was twofold: (1) To function as a reductant in the furnaces, and (2) to function as the primary fuel in the kilns. Its use as a reductant in the furnaces was critical to that operation, which petitioner concedes is a nonmining process. Its use as fuel in the kilns was critical to the nodulizing process, which respondent concedes is a mining process. The statute defines the nodulizing process as a mining process and to treat the fuel for that process as an item with respect to which no cost is associated would distort and understate the costs of the nodulizing process and therefore Monsanto's costs of mining phosphate rock. That result

would be contrary to the statutory objective of providing the miner a depletion allowance measured by his mining costs.

Without question, a nonintegrated miner of phosphate rock would have to incur substantial costs to purchase fuel for the nodulizing process. As explained previously herein, the proportionate profits formula for computation of gross income from mining for an integrated miner-manufacturer anticipates allocations, estimates, and even constructive or imputed income and expense figures. Monsanto's allocation of its actual carbon costs (between the two processes for which the carbon is purchased and which benefit from use of the carbon) is entirely consistent with the objectives of the depletion allowance.

Respondent's argument is based on an erroneous view of the facts. Respondent argues that the costs of carbon are "incurred first in the furnace" and, therefore, that when the carbon is used thereafter in the nodulizing kilns it has no cost. As we view the facts, the costs of carbon (namely, the coke and carbon electrodes) are incurred before the use of the carbon in either the kilns or the furnaces. Those costs are incurred with the intent and understanding that the carbon will play an important role in both processes. After the costs are incurred, the carbon is used in both processes for its intended purposes. The fact that carbon actually is fed into the furnaces and that a change in the form of the carbon occurs in the furnaces (from a hard mineral to CO gas) before it is fed into the kilns does not change the nature or purpose of a portion of the original costs therefor, nor does it justify allocating Monsanto's entire costs for the carbon to the furnaces, and ignoring the role of carbon in the kilns or treating its role in the kilns as a cost-free item.

Although not entirely clear, respondent's argument suggests that a modified "sudden death" rule should apply to costs of an integrated miner-manufacturer. Under such a rule, where the first benefit derived from a cost relates to a nonmining process, that cost would be classified solely as a nonmining cost even though other, subsequent and significant benefits also are derived from the same cost and relate to a mining process. There is support for a "sudden death" rule in determining whether a particular process is a mining

or a nonmining process. See sec. 1.613-4(g)(2), Income Tax Regs.[10] We are not facing such an issue herein, and respondent has referred us to no authority for the application of such a rule to the allocation of costs that benefit both mining and nonmining processes. Furthermore, any such rule would be contrary to the regulations that expressly and repeatedly articulate the rule that costs of mining and nonmining activities must be allocated between the various processes. See secs. 1.613-4(d)(2), 1.613-4(d)(3)(iv), 1.613-4(d)(4)(iii), 1.613-5(a), Income Tax Regs.

### Method of Allocation of Carbon Costs

Monsanto allocates the total costs of the carbon it uses in its integrated elemental phosphate mining-manufacturing plants between the nodulizing process and the furnacing process on the basis of what it would cost Monsanto to use coal as the primary fuel in the kilns. Under this method, Monsanto first determines the amount of heat produced in the kilns by CO gas each year. It then determines how much coal would have been needed to produce that same amount of heat in the kilns. Lastly, it determines what the cost of that amount of coal would have been. The amount thereof is subtracted from Monsanto's total costs of carbon (i.e., the costs of coke and carbon in the electrodes) and is treated by Monsanto as a mining cost in the computation of Monsanto's gross income from mining under the proportionate profits method.

The method described above is referred to by Monsanto as a substitute fuel method. None of the costs of operating the furnace (in which the carbon contained in the coke and electrodes is converted into the CO gas that is piped to the nodulizing kiln) is allocated to the kilns. The only costs subject to allocation under this method are the actual costs of the carbon material itself.

As support for allocation of carbon costs based upon what it would cost Monsanto to use coal as the substitute

---

[10] Sec. 1.613-4(g)(2), Income Tax Regs. provides in part as follows:

(2) *Processes subsequent to nonmining processes.* Notwithstanding any other provision of this section, a process applied subsequent to a nonmining process (other than nonmining transportation) shall also be considered to be a nonmining process. Exceptions to this rule shall be made, however, in those instances in which the rule would discriminate between similarly situated producers of the same mineral. * * *

fuel in the kilns, Monsanto argues that this method puts integrated miners of phosphate rock on a par with nonintegrated miners of phosphate rock who would have to incur fuel costs to complete the nodulizing or mining process. Monsanto also emphasizes that it has used this method for more than 25 years and has been consistent in its use of that method for both financial and tax purposes.

Monsanto also raises three additional, alternative methods under which an allocation could be made of its carbon costs. Monsanto notes that if CO gas were not used in the kilns, it is more likely that natural gas, not coal, would be used as the substitute fuel. On that ground, Monsanto suggests that the cost of natural gas, not coal, should be used as the alternative fuel under the substitute fuel method of allocating carbon costs to the kilns.

Monsanto also suggests that if the substitute fuel method is not acceptable (using either coal or natural gas) as a basis for allocating carbon costs, those costs could be allocated on the basis of a chemical analysis or measurement of how much carbon is either consumed or lost during the integrated operation at each stage of the two treatment processes. Monsanto refers to this method as the carbon tracing method. Respondent argues that any allocation of Monsanto's carbon costs on this basis would be erroneous because it would allocate to the kiln process all of the carbon left in the carbon dioxide gas that exits the kiln, resulting in an excess allocation of carbon costs to the kiln.

The last allocation method suggested by Monsanto is referred to as the "BTU Method" and would allocate the carbon costs based upon a chemical analysis of the respective heating or oxidization capacities in BTU's of the carbon contained in the coke in the furnaces and of the carbon contained in the CO gas in the kilns. Respondent objects to this method on the ground that the function of the carbon in the furnaces is not to produce heat but to act as a reductant by "snatching" oxygen from the nodules of phosphate rock.

Respondent also objects to each of Monsanto's alternative methods on the grounds that an excessive portion of petitioner's total carbon costs would be allocated thereunder

to the kilns and therefore to the mining process and also that a change by Monsanto to any of those methods would constitute a change in Monsanto's method of accounting for its carbon costs. To this last argument, Monsanto notes that section 1.613-4(d)(l)(i), Income Tax Regs., provides that, "A method of computing gross income from mining under the provision of this paragraph shall not be deemed to be a method of accounting for purposes of paragraph (e) of section 1.446-1, Income Tax Regs."

If any allocation of Monsanto's carbon costs to the kilns is allowed, respondent argues that it should be based on the market value of the various products and by-products of the furnaces that are available for sale by Monsanto. Respondent identifies those products as elemental phosphorous, ferrophosphorus, slag, and CO gas. Monsanto does sell the first three products, and the actual sales figures for those products by Monsanto during 1975 and 1976 are in the record herein. Monsanto does not, however, sell the CO gas, but (as previously explained) pipes it to the kilns where it is used as the primary fuel for the nodulizing process. Because we have no sales figures for the CO gas and apparently because no market prices for such gas are available, respondent proposes that we use in his suggested allocation method a constructive value for CO gas based on the substituted natural gas price.

As we understand the alternative methods put forward by the parties and the rather complicated computations submitted with respect thereto, the different methods would allocate petitioner's total carbon costs in 1975 and 1976, the years before us, to the nodulizing kiln process in the following range of percentages:

| Method | Percentage range of carbon costs allocated to nodulizing kiln |
|---|---|
| (1) Monsanto's substitute fuel method using coal: | 9% - 34% |
| (2) Monsanto's substitute fuel method using natural gas: | 23% - 36% |
| (3) Monsanto's BTU analysis: | 55% - 61% |
| (4) Monsanto's carbon tracing analysis: | 81% - 94% |
| (5) Respondent's method based on value of furnace products: | 2% - 3% |

None of the suggested methods represents a perfect method of allocating Monsanto's carbon costs to the nodulizing kiln process. Among other complaints, the use of coal as the substitute fuel can be criticized because the technology is not yet developed for the use of coal fragments as the exclusive fuel in the nodulizing kilns. The use of natural gas as the substitute fuel can be criticized because if natural gas actually were used as the primary kiln fuel, in lieu of CO gas, the costs thereof apparently would put the entire integrated operation into a loss position. The carbon tracing analysis can be criticized because it places too much emphasis on the carbon molecules as if they stand alone and does not recognize that it is the relationship—not the consumption—of carbon molecules to oxygen molecules that is critical to the function of carbon in both the kilns and the furnaces. Furthermore, it ignores the fact that carbon molecules survive their use in the kilns and are exited into the atmosphere from the kilns as carbon dioxide gas. The use of the BTU analysis can be criticized because it does not recognize that carbon's purpose and function in the furnaces is not the same as its function in the kilns.

Respondent's proposed method based on hypothetical sales of CO gas can be criticized because Monsanto does not sell CO gas and no market prices exist therefor. To overcome the latter defect in his method, respondent reverts partially to one of Monsanto's alternative methods (namely, the substitute fuel method using natural gas). Respondent's method (namely, hypothetical sales) bears no relationship to the use or function of carbon in Monsanto's operation.

In our opinion, under the circumstances of this case, we conclude that the most appropriate method for allocating Monsanto's costs of carbon is the method Monsanto has consistently used for many years. It is a reasonable method. It produces an allocation of total carbon costs that is related to and reflects the significant function carbon serves in both the mining and the manufacturing of elemental phosphorous. It also is consistent with the regulations and existing case law.

In summary, our conclusions herein are based on the following points. Coke and carbon electrodes are purchased

for their carbon properties. The costs thereof are not hypothetical but are real costs actually incurred by Monsanto. Carbon is used as a reductant in the furnaces and as the primary fuel in the nodulizing kilns. It is purchased by Monsanto with the specific purpose of being used in the kilns. Such use is not an afterthought. Such use provides direct, substantial, and essential benefits to the nodulizing process that occurs in the kilns.

For more than 25 years and for both financial and tax purposes, Monsanto has allocated its costs of carbon between the kiln and furnace operations on the basis of the costs it would incur to use coal as the primary fuel in the kilns. This method is related to and reflects the function of carbon in Monsanto's mining process. We find no reason to reject Monsanto's method, nor to allow Monsanto at this point in time to adopt a different method.

*Decision will be entered under Rule 155.*